**UNITED STATES**

v.

**Albert R. HARRIS, Yeoman Seaman (E–3), U.S. Navy.**

**NMCM 98 01951.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 6 May 1997.

Decided 21 April 2000.

---

**516**

LT Mari–Rae Sopper, JAGC, USNR, Appellate Defense Counsel.

LT Danette L. Walker, JAGC, USNR, Appellate Government Counsel.

Before DORMAN, Senior Judge, TROIDL, Senior Judge, and ROLPH, Appellate Military Judge.

DORMAN, Senior Judge:

At his special court-martial, a military judge convicted the appellant, contrary to his pleas, of two specifications of larceny of checks and two specifications of forging the stolen checks. The appellant's offenses violated Articles 121 and 123, Uniform Code of Military Justice, 10 U.S.C. §§ 921 and 923. The approved sentence includes confinement for 100 days, a fine of $1000, reduction to pay grade E–1, and a bad-conduct discharge.

We have carefully reviewed the record of trial, the appellant's five assignments of error, and the Government's response. While we find no merit in the issues raised by the appellant, we do find error. We conclude that, following our corrective action, the remaining findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).

### Speedy Trial

The appellant argues that the military judge erred when he denied the appellant's motion to dismiss based on the failure of the Government to bring him to trial within 120 days from the date that he was initially placed on pretrial restriction. He alleges a violation of RULE FOR COURTS-MARTIAL 707, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.). That rule requires that an accused be brought to trial within 120 days of the earlier of either the preferral of charges or the imposition of restraint. The rule also provides that if the charges are dismissed, a new 120 day time period will begin to run from the date of repreferral. R.C.M. 707(a)(3)(A)(i).

The appellant was placed on pretrial restriction on 23 October 1996, and charges were preferred against him on 29 October 1996. Following a brief period of pretrial confinement from 4–8 November 1996, the appellant resumed his pretrial restriction, which continued until 14 November 1996. Under normal circumstances the Government would have been required to bring the appellant to trial within 120 days of 23 October 1996. On 13 November 1996, however, the convening authority withdrew and dismissed the charges against the appellant. The charges upon which the appellant was tried were not preferred until 18 February 1997. The appellant was arraigned on 5 April 1997, well within 120 days of the February date. Accordingly, we find no error. *United States v. Ruffin,* 48 M.J. 211 (1998).

### Sufficiency of Evidence

The appellant also argues that the evidence was both legally and factually insufficient to prove his guilt of any of the crimes of which he was convicted. Following our careful review of the record we do not agree.

■ The test for legal sufficiency requires this court to review the evidence in the light most favorable to the Government. In doing so, if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the evidence is legally sufficient. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Turner,* 25 M.J. 324, 325 (C.M.A.1987). That standard is met in this case.

■ The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, this court is convinced of the accused's guilt beyond a reasonable doubt. *Turner,* 25 M.J. at 325. Reasonable doubt, however, does not mean the evidence must be free from conflict. *United States v. Lips,* 22 M.J. 679, 684 (A.F.C.M.R.1986). In resolving the question of factual sufficiency, we have carefully reviewed the record of trial, the arguments and briefs of counsel, and have given no deference to the factual determinations made at the trial level. Based on that review, we are ourselves convinced beyond a reasonable doubt of the appellant's guilt of each crime of which he was convicted.

■ The appellant worked in the administrative office of his squadron. The squadron's Officers' Coffee Mess Fund was maintained in an unlocked desk drawer near the appellant's desk. The fund was maintained by use of a checking account with Nations Bank. The checks were contained in a ledger with three checks to a sheet. During a monthly audit in the summer of 1996, the custodian of the fund noticed that the last sheet of checks from his checkbook ledger was missing. Two of the checks from that sheet had been negotiated. Although the checks bore what appeared to be the custodian's signature, he testified that he did not sign them.

The two negotiated checks were both made out to the same individual, "Wallis O. Lacey," a Senior Chief in the Navy. The checks were both tendered to a teller at a drive-through window of the First Colonial Branch of Nations Bank in Norfolk, and the individual who tendered the checks received cash. It was a standard business practice at Nations Bank to require a photo identification card when cashing a check. Information from the identification card was then recorded on the front of the check. The tellers who cashed the checks made out to "Senior Chief Lacey" followed this policy and recorded his Virginia Driver's license number on the front of the checks. Senior Chief Lacey testified, however, that he had lost his driver's license prior to the date that the checks were cashed. He also testified that he did not make any of the writing on either check. While there is no direct evidence that the appellant looks like Senior Chief Lacey, the resemblance is alluded to in the record. Record at 152, 164, and 170.

There is also photographic evidence of the appellant tendering one of the two checks on 3 May 1996. It is compelling evidence. Although there is no photographic evidence concerning the second check, the similarities between how both checks were cashed are compelling circumstantial evidence. Finally, there is evidence that the appellant made two cash deposits into his own Nations Bank account totaling $145 on 30 May 1996, the same day the first check was negotiated for $265 in cash. One of these deposits occurred shortly after the check was negotiated. Taken together, along with the permissive inference that since the appellant possessed the recently stolen checks that he stole them, *United States v. Pasha,* 24 M.J. 87, 88–89 (C.M.A.1987), we find that the evidence of record is more than sufficient to satisfy the tests for both legal and factual sufficiency.

### Evidentiary Issues

The appellant raises three evidentiary issues. First, he asserts that the military judge erred in admitting a photograph of the appellant developed from a surveillance videotape recording of transactions at the drive-through teller at the First Colonial Branch of Nations Bank on 30 May 1996. He argues that the photograph lacked sufficient foundation under the "silent witness" theory. Second, he argues that the military judge erred in admitting the log of the video camera as a business record of Nations Bank. Finally, he argues that the military judge erred in ad-

mitting photocopies of the microfiche copies of the two forged checks.

■ All three of these evidentiary issues were raised at trial, and the military judge resolved all three against the appellant. We apply an abuse of discretion standard in reviewing a military judge's decision to admit evidence. *United States v. Johnson,* 46 M.J. 8, 10 (1997); *United States v. Casey,* 45 M.J. 623, 626–27 (N.M.Ct.Crim.App.1996). Applying that standard, we find no error.

■ *Photographic Evidence.* During its case-in-chief, the Government offered several photographs of the appellant that were identified as photos taken at the drive-through teller of the First Colonial Branch of Nations Bank at the time one of the two forged checks was negotiated. The photos were developed from a surveillance videotape. The videotape itself was also entered into evidence but it was not played. The appellant objected to the admission of these photographs based on a lack of foundation to establish their authenticity. Record at 115–16, 141–44. The Government offered the photos under the "silent witness theory." *Id.* at 116. The primary focus of the appellant's appeal is that the Government failed to satisfy the foundational requirements because "insufficient evidence was presented to establish the chain of custody for the videotape or the security, use and testing of the camera." Appellant's Brief of 20 September 1999 at 3.

Neither the Court of Appeals for the Armed Forces, nor this Court, has addressed the "silent witness theory" concerning the admissibility of photographic evidence. It was addressed by the Army Court of Military Review in *United States v. Howell,* 16 M.J. 1003 (A.C.M.R.1983), in which the Army Court affirmed Howell's conviction based partly on the use of photographs taken of him by a camera located in an ATM machine. Howell, like the appellant, challenged the authentication of the photographs. The Army court noted:

[A] more modern approach toward authentication has gained wide acceptance among jurisdictions facing this admissibility issue. This theory, referred to as the "silent witness" theory, allows admission of photographic evidence. Even in the absence of eyewitness verification, when the proponent of the photograph adequately establishes the reliability of the process producing the photograph, the fact finder may then reasonably infer that the contents of the photograph accurately depict the event it is offered to prove. 3 *Wigmore on Evidence* § 790 (1970). This concept of authentication has been adopted by an overwhelming majority of federal circuits.

*Howell,* 16 M.J. at 1005 (supporting citations omitted). Thus, under the "silent witness" theory, such evidence, once authenticated, speaks for itself. *See United States v. Goslee,* 389 F.Supp. 490, 493 (W.D.Pa.1975).

In support of his argument that the Government failed to establish a satisfactory chain of custody over the videotape from which the photographs were made, the appellant also relies upon another decision of the Army Court, *United States v. Reichart,* 31 M.J. 521 (A.C.M.R.1990). Appellant's Brief of 20 Sept. 1999 at 3. While *Reichart* includes a requirement for establishing a chain of custody for a videotape in its discussion of the method by which a videotape is authenticated, *Reichart* did not rely upon the "silent witness" theory. *Reichart,* 31 M.J. at 524.

In response to the appellant's argument, the Government asserts that it is not necessary to establish a "traditional chain of custody" for the videotape. Government's Brief of 18 February 2000 at 5. In support of its position, the Government cites a string of federal and state cases.[1] Specifically, the Government quotes from *Molina v. State,* 533 So.2d 701, 711 (Ala.Crim.App.1988) in support of its position that in such cases "stringent foundational requirements, such as proof of a continuous chain of custody, are

---

1. The Government cites numerous cases involving the authentication of motion pictures and videotapes that apparently were admitted without establishing a chain of custody. In almost all cases, however, a witness testified that the videotape or motion picture accurately depicted certain events. This is the traditional manner in which photographs are authenticated. *United States v. Richendollar,* 22 M:J. 231, 232 (C.M.A. 1986). Where such a witness testifies, the "silent witness theory" is not even implicated.

now almost universally rejected as unnecessary." Government Brief of 18 Feb. 2000 at 9. The Government's Brief, however, does not accurately represent what the Alabama Court of Criminal Appeals had to say.

In *Molina*, the court upheld the admission of the surveillance videotape made at the time Molina was being "booked" at the Mobile City Jail, which showed him making a telephone call. In so doing, the court endorsed the principle of the "silent witness" theory. The court upheld the admission of the videotape on another theory, however, because a police officer who was present at the time Molina was "booked" testified that the videotape "accurately portrayed the telephone call." *Molina*, 533 So.2d at 711. Nevertheless, the court discussed the foundational requirements under the "silent witness" theory:

> The predicate for admission under the "silent witness" theory differs markedly from that customarily permitted under the traditional doctrine. It is neither possible nor wise to establish specific foundational requirements for the admissibility of photographic evidence under the "silent witness" theory, since the context in which the photographic evidence was obtained and its intended use at trial will be different in virtually every case.

> Although the traditional "chain of custody" predicate is not required under the "silent witness" theory, if there are no available witnesses available to verify the accuracy of the recording at issue, then there should be some testimony which establishes the fidelity of the film's portrayal.

> As long as satisfactory evidence of the integrity of the film or videotape is presented, stringent foundational requirements, such as proof of a continuous chain of custody, are now almost universally rejected as unnecessary. An example of a film or tape for which chain of custody might be one appropriate way of establishing authenticity would be a film or tape made with an automatic camera that recorded an event when no human beings were present. But even in this situation, rather than resorting to proof of chain of custody, it usually should be possible to

authenticate the film or tape in some other way, such as by the testimony of a photographic expert who has determined that it had not been altered in any way and was not built-up or faked.

*Id.* at 710–711 (internal cites and quotations omitted).

The discussion in *Molina* concerning the chain of custody would be unnecessary if a videotape were not fungible. As Professor Imwinkelried notes, courts have traditionally taken a strict view towards the admissibility of recordings, recognizing that tapes could be tampered with or distorted. Under the traditional approach, the proponent of the tape was required to account for the custody of the tape. E.J. IMWINKELRIED, EVIDENTIARY FOUNDATIONS, 57–58, 72–75 (2d ed.1989); *see also United States v. Clayton*, 643 F.2d 1071, 1073 (5th Cir.1981)(holding that a videotape was admissible where the Government showed the manner in which the films were used, how cameras were activated, that the film was removed immediately after the crime, established a chain of possession of the film, and the development of the prints.) However, with the development of technological means to detect whether a tape has been altered, the foundational standards have been relaxed. If the integrity of the tape is challenged, an expert witness can be called upon to examine the tape. E.J. IMWINKELRIED, EVIDENTIARY FOUNDATIONS, 57–58, 72–75 (2d ed.1989). Furthermore, "protection against falsification or misrepresentation lies in the requirement of preliminary proof that the picture is an accurate reproduction of the event which it depicts and in the opportunity for cross examination of the witness making such proof." *UAW–CIO v. Russell*, 264 Ala. 456, 88 So.2d 175, 186 (1956).

We join many of the federal circuits and the Army Court, in adopting the "silent witness" theory. *See Howell*, 16 M.J. at 1005–06 and cases cited therein. "Thus a photograph is properly authenticated once sufficient facts are established to support a reasonable inference that the subject matter is what the proponent claims. *See* Mil.R.Evid. 901. This foundational requirement is satisfied circumstantially by evidence which establishes the reliability of the process or

system which produces the photograph." *Howell,* 16 M.J. at 1006. *See also* Mil. R.Evid. 901(b)(9)("evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result" can be used to authenticate evidence).

■ As a minimum, we adopt the following standards for authentication of videotapes offered under the "silent witness" theory. The proponent of the evidence is required to show "the process by which the videotape was taken, i.e. the installation of the camera, testing and removal of the film." *Reichart,* 31 M.J. at 523. Additionally, the proponent must produce evidence concerning the integrity of the tape. This can be accomplished through evidence concerning its chain of custody or evidence to establish that the tape was not tampered with or altered. Applying those standards to the case before us, we find that the military judge did not abuse his discretion in admitting Prosecution Exhibits 8–13.

■ In offering these exhibits, the Government presented evidence that the videotape was recorded by industrial-type video camera equipment that continually recorded the time and date on the tape. The tape also recorded the speed at which the tape was running and indicated whether security locks were in place. The videotape operated automatically and sequentially recorded transactions at the four drive-through windows of the bank, using four separate cameras. The recorded pictures rotated from one teller to the next, pausing at each for a few seconds. Each day, as part of standard procedures within the bank, bank personnel ensured that the equipment was operating properly. This included checking to make sure that the date and time were correct and that the cameras were properly focused. Record at 137–38, Prosecution Exhibit 14 at 7. Bank employees also numbered the tapes, and used a log to maintain them, recording when the tape is placed into the recorder and when it was removed. Any malfunction in the equipment was also to be recorded in the log. When a

tape was removed from the recorder it was maintained in a locked storage cabinet at the bank and stored for six months. It could then be reused.[2]

At the time check No. 2952 was negotiated, the teller machine printed information on the check indicating that it was cashed at 1245 on 30 May 1996, and that it was cashed by teller No. 6 at the First Colonial Branch of Nations Bank. The bank's computers generated this information. Using the time and date that was continuously recorded on the videotape, it was determined that there was only one customer using the drive-through tellers at that time on that date. Still photos were then made of that individual from the bank videotape. These photos were of the drive-through at the First Colonial Branch. Record at 111. In reviewing the tape, the bank's fraud investigator found that, as the recorded view rotated between tellers, each screen contained the required data concerning time and date. He noticed nothing unusual about the tape, and it seemed to function properly. There were no gaps on the tape or anything that "caught his eye." Record at 113–14. Once an investigation was initiated into the checks, the fraud investigator from Nations Bank requested the videotape for 30 May 1996. He received it in a confidential envelope sent through inter-office mail. It was sent to him on 17 October 1996, and the log was so annotated. Record at 133; Prosecution Exhibit 14.

Mil.R.Evid. 901 provides that authentication is "satisfied by evidence sufficient to support a finding that the matter in question is what it purports to be." Based upon the evidence we summarized above, we find that standard to be met. We also find that this evidence easily meets the foundational requirements we set out above for the admission of evidence under the "silent witness" theory. Here, the Government demonstrated the process by which the videotape was taken, and the routine procedures employed by the bank to ensure that the equipment was operating properly. The Government also demonstrated a satisfactory chain of cus-

---

2. The videotape that may have recorded the cashing of check No. 2951 at the First Colonial Branch of Nations Bank on 6 June 1996 was not requested by the investigators until more than 6 months after the transaction. By that time the tape had been reused. Record at 130.

tody concerning Prosecution Exhibit 2 from the time it was removed from the video recorder until it was used to produce still pictures of the appellant. Furthermore, the Government offered testimony that the still pictures accurately represented what the bank's fraud investigator had seen on the tape. Finally, the Government offered unrebutted evidence from which it may be inferred that the tape had not been tampered with or altered. Accordingly, the military judge did not abuse his discretion in admitting Prosecution Exhibits 8–13.

*The Video Camera Log.*[3] The appellant also argues that the military judge erred in admitting Prosecution Exhibit 14, the log maintained by employees of Nations Bank concerning the operation of the surveillance cameras. He summarily argues that the logbook did not meet the requirements of a business record. We find no abuse of discretion in admitting the logbook.

Mil.R.Evid. 803(6) recognizes the business record exception to the general rule precluding the use of hearsay evidence. Generally, such records are admissible if prepared in the regular course of business and when recorded by a person who has knowledge of the event recorded, at or near the time of the event. *Id.; United States v. Garces,* 32 M.J. 345, 347 n. 2 (C.M.A.1991); *United States v. Casey,* 45 M.J. at 626. The proponent of the records need only show by a preponderance of the evidence that the records meet these requirements to establish their admissibility. *Casey,* 45 M.J. at 626 (citing *United States v. Tebsherany,* 32 M.J. 351, 355 (C.M.A.1991)). Upon review of the evidence on this issue, summarized above in the section concerning photographic evidence, we find the standard has been met. We specifically note the testimony of the fraud examiner that this video camera log was kept in the regular course of business. We also note the testimony of one of the

bank tellers that the log was completed at the time the tape was being changed, that the individual recording the information was to have personal knowledge of it, and that everyone learned the procedures. Record at 131, 138. Accordingly, we find that the military judge did not abuse his discretion in admitting Prosecution Exhibit 14.

*The Checks.* The appellant argues that the military judge erred in admitting microfiche copies of copies of the two checks he was convicted of stealing and forging. While recognizing the general rule that Mil.R.Evid. 1003 authorizes the use of a duplicate, he argues that their use in this case falls under the second exception contained in that rule. Specifically, he argues that it was unfair to admit duplicates in this case because, without the originals, handwriting examiners were not able to state an opinion as to who wrote the checks. Appellant's Brief of 20 Sept. 1999 at 5–6. The original checks could not be located, and the appellant does not contest the authenticity of the duplicates.[4] The appellant cites no direct authority in support of his argument. We find no abuse of discretion.

The appellant is correct in his assessment that the quality of the copies of the checks hindered the ability of the handwriting examiner to state an opinion as to who wrote the checks. The examiner also stated, however, that he did not know if he would have been able to state an opinion as to who the author of the checks was even if he had the original documents to examine. Record at 83. Furthermore, as the military judge noted at trial, the quality of the copies also worked against the Government. Although the handwriting examiner testified that the appellant may have made the writing on the check, the quality of the documents was far from what would be necessary to support a "conclusive determination." Record at 81.

---

3. This log was used to document the operation of the video recorder. The video recorder recorded the images viewed by the four cameras used at the drive-through windows at the First Colonial Branch of Nations Bank.

4. The tellers who cashed the checks identified them. They based their identification upon

recognizing their own handwriting on the checks. Following bank procedures, they recorded driver's license information presented by the person who negotiated the checks. Additionally, the Government presented evidence concerning how the checks were processed by Nations Bank.

 Here the appellant essentially asks for production of the "best evidence." There is, however, no general rule in the military that only the best evidence is admissible in trials by court-martial. *See United States v. Perez*, 36 M.J. 583, 585 (A.F.C.M.R. 1992), *aff'd*, 40 M.J. 373 (C.M.A.1994). The issue the appellant raises goes to the weight to be afforded the documents, not their admissibility. Accordingly, the military judge did not abuse his discretion in admitting duplicate copies of the checks.

### Larceny

Although not raised by the appellant, a more fundamental problem exists in his court-martial. The appellant stands convicted of two separate specifications of larceny of a check. The evidence, however, revealed that the checks were kept together in the lower desk drawer in the office in which the appellant worked. The checks that were stolen were taken from a check ledger. Each page in the ledger contained three checks that could be separated by tearing them along perforations. The two stolen checks were both contained on the last page of the ledger. Furthermore, no evidence was presented as to when the appellant stole the checks. Therefore, based on the evidence before us, we find that that the checks were both taken at the same time. The Manual for Courts–Martial addresses this situation:

> When a larceny of several articles is committed at substantially the same time and place, it is a single larceny even though the articles belonged to different persons. Thus, if a thief steals a suitcase containing the property of several persons or goes into a room and takes property belonging to various persons, there is but one larceny.

MCM, Part IV, ¶ 46c(1)(h)(ii). Thus, as a matter of policy, where a single act results in the theft of multiple items of personal property, only one larceny is to be charged. *United States v. Lepresti*, 52 M.J. 644, 653 (N.M.Ct.Crim.App.1999). We are also unconvinced that the larceny occurred on or about 15 May 1996, but only that it occurred on or before 30 May 1996. We will provide relief in our decretal paragraph.

### Conclusion

Accordingly, we consolidate Specifications 1 and 2 of Charge I into a single specification to read as follows:

> Specification: In that Yeoman Seaman Albert R. Harris, U.S. Navy, Fighter Squadron ONE HUNDRED ONE, Naval Air Station Oceana, Virginia Beach, Virginia, on active duty, did, at Fighter Squadron ONE HUNDRED ONE, on or before 30 May 1996, steal a sheet of checks containing check numbers 2951 and 2952 from Nations Bank account # 0006004547, of some value, the property of Fighter Squadron ONE HUNDRED ONE Officers' Coffee Mess.

With this modification, we affirm the findings. Based upon our action on the findings, we have reassessed the appellant's sentence in accordance with the principles of *United States v. Cook*, 48 M.J. 434, 438 (1998), *United States v. Peoples*, 29 M.J. 426, 428 (C.M.A. 1990), and *United States v. Sales*, 22 M.J. 305, 307–308 (C.M.A.1986). Upon reassessment, we approve a sentence that includes confinement for 90 days, a fine of $1000, reduction to pay grade E–1, and a bad-conduct discharge. An appropriate convening authority will issue a corrected promulgating order consistent with this decision.

Senior Judge TROIDL and Judge ROLPH concur.