UNITED STATES, Appellee

V.

Albert R. HARRIS, Yeoman Seaman

U.S. Navy, Appellant

No. 00-0553

Crim. App. No. 98-1951

United States Court of Appeals for the Armed Forces

Argued January 9, 2001

Decided September 24, 2001

BAKER, J., delivered the opinion of the Court, in which CRAWFORD, C.J., and SULLIVAN, GIERKE, and EFFRON, JJ., joined.

Counsel

For Appellant:  Lieutenant Hardy Vieux, JAGC, USNR (argued); Lieutenant Mari-Rae Sopper, JAGC, USNR.[1]

For Appellee: Colonel Marc W. Fisher, Jr., USMC (argued); Lieutenant Commander Philip L. Sundel, JAGC, USNR, and Lieutenant Danette L. Walker, JAGC, USNR (on brief).

Military Judge:  Mark S. Utecht

**THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION**

---

[1]  The Court notes with regret that Lieutenant Sopper was killed on September 11, 2001, when the airliner on which she was flying was hijacked by terrorists and crashed into the Pentagon.

United States v. Harris, No. 00-0553/NA

Judge BAKER delivered the opinion of the Court.

Appellant, a Yeoman Seaman (E-3) in the United States Navy, was convicted, contrary to his pleas, of two specifications each of larceny and forging checks with the intent to defraud, violations of Articles 121 and 123, Uniform Code of Military Justice, 10 USC §§ 921 and 923, respectively. A military judge sitting as a special court-martial sentenced appellant to a bad-conduct discharge, confinement for 100 days, a fine of $1,000, and reduction to pay grade E-1. The convening authority approved the sentence as adjudged. The Court of Criminal Appeals consolidated the larceny specifications and, with that modification, affirmed the findings. Reassessing the sentence, the court approved only so much as provided for a bad-conduct discharge, confinement for 90 days, the fine of $1,000, and the reduction in pay grade. United States v. Harris, 53 MJ 514 (NM Ct. Crim. App. 2000). We granted review of the following issues:

I.

WHETHER THE LOWER COURT ERRED IN HOLDING THAT THE GOVERNMENT SATISFIED THE FOUNDATIONAL REQUIREMENTS FOR THE AUTHENTICITY OF A VIDEOTAPE UNDER THE "SILENT WITNESS" THEORY, WHERE THE CHAIN OF CUSTODY WAS INADEQUATE AND NO PHOTOGRAPHIC EXPERT TESTIFIED REGARDING THE INTEGRITY OF THE TAPE.

II.

WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION WHEN, OVER DEFENSE OBJECTION, HE ADMITTED THE VIDEO CAMERA LOG SHEET UNDER THE "BUSINESS RECORDS" EXCEPTION TO THE HEARSAY RULE, WHERE THE EVIDENCE DID NOT ESTABLISH THAT THE LOG QUALIFIED AS A "RECORD OF REGULARLY CONDUCTED BUSINESS ACTIVITY."

We resolve these issues against appellant and affirm.

## Background

The charges arose from two negotiated checks from an officer's "coffee mess" checking account maintained by Fighter Squadron 101, Naval Air Station Oceana in Virginia Beach, Virginia. Appellant was assigned to the squadron's personnel office, where the checks for the fund were kept. A routine audit by Lieutenant (Lt) Anton Papp, who maintained the fund, revealed that check #2951 for $560.00 had been cashed out of sequence. On further investigation, Lt Papp discovered that additional checks were missing and that check #2952 for $265.00 had also been cashed.

Lt Papp obtained copies of checks #2951 and #2952 from Nations Bank and discovered that they had been signed using his name, though he testified that it was not his signature. Both checks were made out to Wallis Lacey, a Navy Senior Chief, who had lost his Virginia driver's license at an earlier date. Senior Chief Lacey's missing license had been used as identification to cash both checks at the drive-up windows of the First Colonial branch of Nations Bank in Virginia Beach.

Using the date and time information that was automatically printed on the checks at the time of the transactions, the bank fraud investigator, Mr. James Therrien, was able to locate the video camera tape of the drive-up windows at the bank. The video recorder, calibrated to the bank's computer clock, sequentially

recorded footage from cameras at the bank's four drive-up lanes and automatically recorded the date and time, cycling between the four lanes every two seconds. Mr. Therrien ran the tape through the video recording device at his office and was able to "freeze frame" the tape segments and print out photographs depicting the events on the date and two minutes before the time check #2952 was cashed (May 30, 1996, 12:45 p.m.). The photographs showed appellant using the drive-up windows at that time. Moreover, Mr. Therrien testified that the video sequence on the tape, which recorded activity at all four drive-up lanes, indicated that appellant was the only one using the drive-up windows at the time.[2]

The bank had a policy of storing the video tapes after the counter on the tape reached 5000 and not reusing the tapes again for 6 months. Because 6 months had passed since the storing of the tape containing the transaction relating to check #2951, that tape was not available since its contents had been recorded over.

---

[2] The photographs, Prosecution Exhibits 8, 9, 10, and 11, appear clear enough for the military judge to have been able to compare them to appellant, who was present in the courtroom.

At trial, the Gvernment called Mr. Therrien and Ms. Roberts, one of the bank's tellers, to lay the foundation for admission of the photographs into evidence. Besides relating how he located the video tape and printed the photographs from the tape segments, Mr. Therrien testified as to his knowledge of Prosecution Exhibit 14 (PE 14), the logbook used to record the handling of the security video tapes. He testified that PE 14, the "Security Video Tape Library/Inspection Log," was a "standard log set up at every one of the banking centers under procedures by the security department to control the VCR tapes." Further, he indicated bank personnel made entries and initialed the log when a tape was placed in the video recording device, when the tape was removed and placed in storage, when the tape was sent to some location outside the bank, and when there was a malfunction of any type in the video system. While he was not familiar with all of the initials on PE 14, he did recognize some of them. Further, he was able to show on PE 14 the notation indicating that the tape he requested relating to check #2952 had been sent to him via interoffice mail, and he testified that he kept it until giving it to a military investigator. He also indicated that the individuals making the entries were required to have personal knowledge of the information they recorded in the log. Finally, he testified the log was "prepared in the course of the business of the banking center."

Ms. Roberts testified that her duties included, among other

things, handling the video tapes.  Like Therrien, she was
familiar with the log, and because her duties required her to
make entries, she was intimately familiar with the use of the
log.  Specifically, she testified that the video camera
surveillance system was checked every morning as part of the
procedure to open the bank for business.  Tapes were changed when
the tape recording counter reached 5000.  If a tape needed
changing, a new one was placed in the machine by an employee who
then watched the monitor to ensure the system was recording on
the new tape.  All of these actions were recorded in the log.
Regarding PE 14, she indicated that the instructions for
recording entries in the log were printed on the reverse side of
the log sheet.  Like Therrien, she also testified that the log
was kept in the normal course of the bank's business.
Notwithstanding this evidence, trial defense counsel continued to
object, arguing that the foundation for admitting the photographs
and the log sheets was insufficient.  This objection was
overruled, and the photographs and the log sheet were admitted.

## Discussion

The Government offered the photographs under the so-called
"silent witness" theory.  This theory allows authentication of
photographs by the reliability of the process that created them,
without the need of a human witness to the events shown by the
film.  2 John W. Strong, et al., McCormick on Evidence § 214 at
15 (5th ed. 1999).  Appellant argues that the evidence from the

bank's video surveillance camera is inadmissible as substantive evidence because it was not properly authenticated. He also claims that the supporting documentary evidence, the videotape logbook, is hearsay.

Appellant does not dispute that the "silent witness" theory of authenticating evidence was the appropriate theory in this case. Instead, he claims that the lower court abused its discretion in applying the test because the foundational requirement was not met. Appellant contends that: (1) the Government did not offer evidence as to the operative condition of the camera on May 30, 1996; (2) the procedures of the bank for handling the videotape were inadequate to prevent tampering; (3) the testimony of two bank employees was inadequate to show that the videotape was admissible; and (4) the testimony of the bank's fraud expert was insufficient to establish the tape had not been altered. Finally, appellant argues that the videotape logbook should not have been admitted under the business record exception to the hearsay rule, Mil.R.Evid. 803(6), Manual for Courts-Martial, United States (2000 ed.).[3]

The Government argues for the admissibility of the videotape evidence under the "silent witness" theory. While this Court has never directly addressed the question of the foundational requirements for videotapes under the "silent witness" theory,

---

[3] All Manual provisions cited are identical to the ones in effect at the time of appellant's court-martial.

United States v. Harris, No. 00-0553/NA

the Government argues that this Court should adopt the prevailing
view of the federal and state courts.  The Government believes
the testimony of the bank's fraud examiner was sufficient under
the prevailing view to show the proper operation and reliability
of the camera.  The Government claims that the logbook system
used by the bank to record the movement of surveillance
videotapes was adequate to show a chain of custody and to show
that the tape was admissible as a business record under
Mil.R.Evid. 803(6).

Lastly, the testimony of Mr. Therrien and Ms. Roberts was
sufficient, in the Government's view, to lay a foundation for the
admission of the videotapes, since both could testify to the
general practice of keeping the logbook.  Thus, there are two
interrelated issues in this case: 1) the admissibility of the
logbook used to track the videotape, and 2) the authentication of
the videotape.

### Admissibility of the Logbook

The videotape logbook was admitted under Mil.R.Evid. 803(6),
an exception to the hearsay rule for "[r]ecords of a regularly
conducted activity."  "A military judge's decision to admit or
exclude evidence is reviewed for abuse of discretion."  United
States v. Allison, 49 MJ 54, 57 (1998).  Mil.R.Evid. 803(6)
prevents the exclusion as hearsay of a

> memorandum, report, record, or data compilation, in any
> form, of acts, events, conditions, opinions, or
> diagnoses, made at or near the time by, or from
> information transmitted by, a person with knowledge, if

> kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information of the method or circumstances of preparation indicate lack of trustworthiness.

(Emphasis added.) The wording of Mil.R.Evid. 803(6) mirrors Fed. R. Evid. 803(6), and should be satisfied by similar factual findings.

> A writing is admissible under Fed.R.Evid. 803(6) if two foundational facts are proved: (1) the writing is made or transmitted by a person with knowledge at or near the time of the incident recorded, and (2) the record is kept in the course of regularly conducted business activity. . . . These facts must be proved through the testimony of the custodian of the records or other qualified witness, though not necessarily the declarant. . . . The record will not be admissible, however, if the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

United States v. Miller, 771 F.2d 1219, 1237 (9th Cir. 1985) (citations omitted); see United States v. Casey, 45 MJ 623, 626 (NM Ct. Crim. App. 1996).

This Court has held that a witness only needs to be generally familiar with the process in order to be "qualified" under Mil.R.Evid. 803(6). United States v. Garces, 32 MJ 345, 347-48 (CMA 1991). In this case, the Government clearly met the standard of Mil.R.Evid. 803(6) through the testimony of the two bank employees: Mr. Therrien and Ms. Roberts. The testimony of Mr. Therrien established him as a qualified witness. He was the bank fraud examiner for the Norfolk, Virginia, area and was familiar with the videotape and logbook system. He testified

that the logbook entries were made when a tape was changed.  He also stated that the entries were initialed when made and were made by people with personal knowledge.  His testimony also established that the logbook was routinely used at all of the branch banks and was kept in the course of business.

The testimony of Carol Roberts, a teller at the bank, also met the requirements of Mil.R.Evid. 803(6).  She was a qualified witness who testified that she made entries in the logbook herself.  She discussed how entries were made when the tapes were changed and that this was regular procedure.  The procedure was also noted on the back of the logbook itself.  While Ms. Roberts did not make the logbook entry on the day in question, she could identify the initials for that day as those of Cindy Fernando, another teller.  The testimony of both bank employees shows that the logbook qualified as a business record under Mil.R.Evid. 803(6).  Thus, the military judge did not abuse his discretion, and the evidence was properly admitted.

## Authentication of the Videotape

Appellant challenges the Court of Criminal Appeals holding that the surveillance camera videotape was properly authenticated and, therefore, admissible.  When our Court reviews a decision of a Court of Criminal Appeals on a military judge's ruling, "we typically have pierced through that intermediate level" and have examined the military judge's ruling, and then decided whether the Court of Criminal Appeals was correct in its examination of

the military judge's ruling. See United States v. Siroky, 44 MJ 394, 399 (1996). A military judge's decision to admit evidence is reviewed for abuse of discretion. United States v. McElhaney, 54 MJ 120, 129 (2000); United States v. Schlamer, 52 MJ 80, 84 (1999); United States v. Sullivan, 42 MJ 360, 363 (1995).

Appellant also challenges the authentication of the "freeze frame" photographs taken from the tape on the grounds that the "silent witness" theory of authentication was misapplied in this case. While this Court has not previously adopted this theory of authentication, the facts of this case support the lower court's adoption of the "silent witness" theory and its proper application to these facts.

### The "Silent Witness' Theory of Authentication

Generally, a photograph is admitted into evidence as "a graphic portrayal of oral testimony, and becomes admissible only when a witness has testified that it is a correct and accurate representation of relevant facts personally observed by the witness." McCormick on Evidence, supra at 14. However, over the last 25 years, the "silent witness" theory of authentication has developed in almost all jurisdictions to allow photographs to substantively "speak for themselves" after being authenticated by evidence that supports the reliability of the process or system that produced the photographs. Id. at 16 & nn.15-18.

The threshold case for automated camera evidence is United States v. Taylor, 530 F.2d 639, 641-42 (5th Cir. 1976). In that

11

case, footage recording a robbery that was taken after bank employees were locked in the bank vault was admitted, despite the fact that no one could testify as to the events shown.  Rather, witnesses testified about "the manner in which the film was installed in the camera, how the camera was activated, the fact that the film was removed immediately after the robbery, the chain of its possession, and the fact that it was properly developed and contact prints made from it."  Id. at 642.

The federal circuits that have examined the issue have followed this "silent witness" approach.  United States v. Bynum, 567 F.2d 1167 (1st Cir. 1978); Mikus v. United States, 433 F.2d 719 (2d Cir. 1970); United States v. Clayton, 643 F.2d 1071 (5th Cir. 1981); United States v. Gordon, 548 F.2d 743 (8th Cir. 1977); Diane M. Allen, Annotation, Admissibility of Visual Recording of Event or Matter Giving Rise to Litigation or Prosecution, 41 A.L.R. 4th 812 (1985 & Supp. 2000)(citing federal and state cases).

The Navy-Marine Corps and Army Courts of Criminal Appeals have also adopted the "silent witness" theory.  Harris, 53 MJ at 520; United States v. Howell, 16 MJ 1003, 1005-06 (ACMR 1983); United States v. Reichart, 31 MJ 521 (ACMR 1990).  In light of this line of federal cases demonstrating, over a 25 year span, the evidentiary reliability of the "silent witness" theory, we adopt it for military courts as well.  Any doubt as to the general reliability of the video cassette recording technology

12

has gone the way of the BETA tape.

### Authentication under the Military Rules of Evidence

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  Mil.R.Evid. 901(a)(emphasis added). Mil.R.Evid. 901(b)(9) specifies that proper authentication can be provided by "[e]vidence describing a process or system used to produce a result and showing that the process or system produces an accurate result."  (Emphasis added.)  The guiding issue here is what quantum of evidence about the recording process and system is sufficient to support a finding that automated video camera footage is authentic under Mil.R.Evid. 901(b)(9).

In appellant's case, the court below used reasoning similar to that in Taylor, supra, to permit the authentication of this videotape under the "silent witness" theory.  Looking to an earlier Army Court of Criminal Appeals decision, the court below required the proponent to show evidence of

> "the process by which the videotape was taken, i.e. the installation of the camera, testing and removal of the film". . . [and] evidence concerning the integrity of the tape . . . through evidence concerning its chain of custody or evidence to establish that the tape was not tampered with or altered.

53 MJ at 520 (quoting Reichart, supra at 523).

Based on the requirements of Mil.R.Evid. 901(b)(9), we hold that the record establishes a reasonable foundation for authenticating the photos taken by the automated camera: (1) the

13

system was reliable; (2) the system was in working order when the photo was taken; and (3) the film was handled and safeguarded properly from the time it was removed from the camera until the time of trial. Edward J. Imwinkelried, et al., 1 Courtroom Criminal Evidence § 411 at 124 (3d ed. 1998); Reichart, supra.

The reliability of the camera system can, but need not, be shown by an expert witness. In recent cases, witnesses have established reliability without describing the technical mechanics of the operation of the camera. Instead, evidence of a time and date on the film has been sufficient to show that the camera was working when the picture was taken. Evidence of the integrity of the photography can be established through testimony showing that the tapes or photographs have not been altered and have not been the subject of tampering.

For example, the D.C. Circuit held that photographs from an ATM machine were admissible, even though the authenticating witness was merely the custodian of the records and did not testify as to the reliability of the system or the details of its functioning. United States v. Rembert, 863 F.2d 1023, 1026-29 (D.C. Cir. 1988). The pictures were considered reliable because: (1) they were confirmed by victim witnesses; (2) the date, time, and place were indicated; and (3) there was testimony concerning the security of the film and the loading of the camera.

More recently, that court has admitted such photos using a more relaxed standard, without any eyewitness or expert

14

testimony.  United States v. Fadayini, 28 F.3d 1236, 1241 (D.C. Cir. 1994) (ATM photos authenticated by the testimony of bank personnel regarding the recording system and time/date indicia on the photo); See State v. Colby, 431 A.2d 462, 464 (Vt. 1981) (photographs made from surveillance videotape admitted based on evidence that time/date stamp and videotape matched, machine was functioning properly, and photographs were an accurate representation of videotape); Ex Parte Rieber, 663 So.2d 999, 1008 (Ala. 1995)(videotape analyzed under "silent witness" theory when no witness can testify to what appeared in the tape footage); Diane M. Allen, Annotation, supra.

## Evidence of Operability

Appellant argues that neither Mr. Therrien nor Ms. Roberts could testify to the operative condition of the camera on the day that the check was cashed.  In this case, the Government established that the bank's video camera system continually recorded the drive-up windows of the bank, switching at two-second intervals between the cameras in the four drive-up windows.  53 MJ at 520.  The videotape recorded the time and date, and this information was checked regularly when the tapes were changed.  The tapes were numbered when they were removed and noted in a logbook, and stored in a locked cabinet for 6 months, after which they were reused.  Mr. Therrien examined the time, date, and teller-number information printed on the back of the check in question, requested and received the videotape covering

that time period, located the time period on the tape, and printed out pictures.  He also testified that appellant's car was the only one in the drive-up lanes during this period.  This level of detail about the process of video monitoring, notation of time and date, and storage of the tapes meets the authentication requirement of "describing a process or system used to produce a result and showing that the process or system produces an accurate result."  Mil.R.Evid. 901(b)(9).

Testimony as to the technical operation of the video camera on the day in question was unnecessary, just as testimony from the actual camera operator or an expert in photography is unnecessary in order to admit a photograph.  United States v. Hobbs, 403 F.2d 977, 978 (6th Cir. 1968)(noting that photographs are well-accepted evidence and that expert testimony on the process is unnecessary).  Evidence of the bank's procedures and the date and time on the film is enough to support a finding that the camera operated on that day, absent evidence sufficient to rebut this contention.  Fadayini, supra; United States v. Stearns, 550 F.2d 1167, 1171 (9th Cir. 1977)(opinion by Judge [now Justice] Kennedy noting that a photograph can support its own authenticity by what appears in the picture).

## Chain of Custody

The evidence of the process in this case also accounts for the integrity of the videotape.  Appellant claims that the testimony fails to establish a chain of custody for the videotape

16

for the time before it was delivered to Mr. Therrien.  The record reflects that, consistent with the bank's practice, the tape was removed from the video recorder by a bank employee.  That fact was recorded in the log.  The tape was kept in a storage room until it was sent to Therrien upon his request.  Therrien, in turn, maintained possession of the tape until he surrendered it to investigators.  Appellant, on the other hand, has offered no evidence, outside speculation, that the tape was mishandled or altered.  Moreover, to establish chain of custody, "[t]he Government is not required to exclude every possibility of tampering."  United States v. Maxwell, 38 MJ 148, 150 (CMA 1993).

Current computer technology makes alteration of photographs a possibility any time that photographs are used.  However, the Government need only show by direct or circumstantial evidence a "reasonable probability" that the evidence is authentic.  Id. at 150-51.  That burden is met here by the evidence noted above regarding the removal and storage of the videotapes, the date/time indicator on the film, and the testimony regarding Mr. Therrien's request and receipt of the tape.  The logbook notes that the tape was sent to him, and he testified that he received it by interoffice mail.

In addition, a mere claim that photographs may be altered should not bar their admission.  The proponent is not required to prove a negative.  Gaps in the chain of custody "go to the weight of the evidence, rather than its admissibility."  Id. at 152

17

(quoting United States v. Olson, 846 F.2d 1103, 1117 (7th Cir. 1988)).  While it is possible that a tape can be altered, the evidence establishes a reasonable probability that the photographs accurately show the drive-up lanes on the date and time noted and, therefore, are what their proponent claims under Mil.R.Evid. 901(a).  Therefore, we conclude that the military judge did not abuse his discretion in admitting this evidence, and the court below did not err in holding that the foundational requirements for this evidence were met.

## Conclusion

The log sheet having been properly admitted, we hold the photographs and the video tape were properly authenticated.

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.