### UNITED STATES

v.

### George H. ELMORE, Jr., Postal Clerk Seaman (E–3), U.S. Navy.

### NMCM 99 01013.

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 22 May 1998.

Decided 26 Oct. 2001.

---

Capt Curtis M. Allen, USMC, Appellate Defense Counsel.

LCDR Eugene W. Smith, JAGC, USNR, Appellate Government Counsel.

LCDR Jean M. Kilker, JAGC, USNR, Appellate Government Counsel.

LT James E. Grimes, JAGC, USNR, Appellate Government Counsel.

Before ANDERSON, Senior Judge, VILLEMEZ, Appellate Military Judge, and PRICE, Senior Judge.

PRICE, Senior Judge:

Contrary to his pleas, the appellant was convicted by a general court-martial, consisting of officer and enlisted members, of dereliction of duty (five specifications), false official statement (one specification), larceny (six specifications), forgery (five specifications),

and larceny of mail matter (six specifications), in violation of Articles 92, 107, 121, 123, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892, 907, 921, 923, and 934. The convening authority approved the adjudged sentence of confinement for three years, reduction to E–1, forfeiture of all pay and allowances, a fine of $3,421.00, and a bad-conduct discharge.

In this appeal, the appellant contends that: (1) the military judge erred in admitting expert handwriting testimony, (2) the evidence is factually and legally insufficient, (3) the military judge failed to instruct the members on the prosecution's improper sentencing argument, (4) there is an unreasonable multiplication of charges, and (5) certain specifications involving one victim should be consolidated as being a "multiple article larceny." We have carefully considered the record of trial, the assignments of error, and the Government's response. Except as noted below, we conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. *See* Arts. 59(a) and 66(c), UCMJ, 10 USC §§ 859(a) and 866(c). Although not assigned as error, we note that the court-martial promulgating order omits the reduction in rate in stating the adjudged sentence. We will direct corrective action in our decretal paragraph.

### Facts

This is a case about six money orders totaling $3,421.00 that were stolen from the mail at the Navy's Fleet Post Office (FPO) in Guantanamo Bay, Cuba, then forged and cashed. During the months of August, September, and October of 1996, four customers came to the FPO and purchased these money orders. While in the post office, they each prepared the money orders for mailing, deposited the packages into the outgoing mail slot or handed them to a postal clerk for mailing, then left. None of the six money orders reached the family members for whom they were intended. There is no dispute about the foregoing facts. The bone of contention is the identity of the person(s) who committed these crimes.

Petty Officer (PO) Pedrero testified that a female postal clerk sold her three money orders. She filled them out payable to her mother and inserted them and a videotape into an envelope, then handed it to a tall, black, skinny, male postal clerk. She did not know him at that time, but at trial identified the appellant as being that postal clerk. She also testified that she remembered seeing the appellant while she was buying the money orders and filling them out. PO Pedrero's mother ultimately received the videotape but did not receive the money orders.

Mr. Santarin testified that a tall, black man sold him a money order. Unlike the first victim, there was no in-court identification of the appellant. Mr. Santarin filled out the money order payable to a money exchange firm that was to forward payment to his wife in the Philippines, then sealed it in an envelope and dropped it in the outgoing mail slot.

Mr. Adriano testified that a black man sold him a money order. As with Mr. Santarin, there was no in-court identification of the appellant. He also filled out the money order payable to the same money exchange firm for the benefit of his wife in the Philippines, then sealed it in an envelope and gave it to a tall man with the same skin color as his own who had kinky hair.

Ms. Kluding testified that a tall, black man sold her two money orders, one for $700.00 and one for $200.00. She positively identified the appellant as being that man. After filling them out payable to her mother, she sealed them in an envelope and gave it to the appellant for mailing. He told her he would take care of it. After learning that her mother did not receive either money order, Ms. Kluding filed a tracer on them. She was later advised that the $700.00 money order was voided, or "spoiled," although she testified that she did not void it. Under standard postal procedures, such a voided money order would have been documented, then destroyed. She was reimbursed for the $200.00 money order, apparently after the post office could find no record of its whereabouts or

evidence of it having been cashed.[1]

Copies of five of the six stolen money orders were admitted in evidence. The sixth money order sold to Ms. Kluding was the one that was voided. On the back of each of the other five money orders were three different handwritings: (1) the signature endorsement, (2) a personal identification number (social security number for military personnel and employee identification number for civilians involved in this case), and (3) a set of initials. According to the testimony of the Postal Officer, regulations required the customer who desires to cash a money order to sign the back of the money order. The postal clerk then writes the customer's identification number below the endorsement along with his own initials.

The purported signatures of the customers appear on the back of each of the five money orders. As to the customer identification number, it was incorrect on each of the five money orders with the exception of money order # 80874362676 sold to PO Pedrero. The initials found on the back of each of the money orders were "GE," again except for money order # 80874362676. The initials on the back of that money order were "JR."

The witnesses testified they did not write the endorsement signatures or the personal identification numbers (social security numbers or employee identification numbers) found on the back of the money orders. An expert witness in handwriting analysis testified that there was sufficient cause to conclude that the appellant may have written the signatures, numbers, and initials on four of the five money orders placed in evidence, but that the evidence was far from conclusive. As to the fifth money order sold to Mr. Adriano, the witness testified similarly as to the employee identification numbered and initials, but that as to the endorsement, a conclusion on the appellant's possible authorship was not possible.

Postal records established that, as indicated by the testimony of the customer witnesses, the appellant sold the money orders to Mr. Santarin, Mr. Adriano, and Ms. Kluding, but that a female postal clerk sold the money orders to PO Pedrero. An additional piece of evidence tying the appellant to Ms. Kluding's money order was his purchase of a $700.00 money order on the same date that her $700.00 money order was purchased and voided. His money order was deposited in his credit union account the next day, followed by a $600.00 withdrawal.

The appellant and two other postal clerks fit the description of a tall, thin, black male. As to the initials found on the money orders, of the postal clerks working at the FPO during the time in question, only the appellant had the initials "GE."

Finally, the Government offered evidence of the appellant's personal financial strain to show a motive for stealing and cashing these money orders. Within two months of his arrival at Guantanamo Bay, the appellant was in debt to the Navy Exchange for nearly $3,000.00. By agreement, the appellant was obligated to begin making payments to the Navy Exchange of $87.00 every payday beginning 1 August 1996. On 14 August, the agreement was modified to require payments of $300.00 every payday until the debt was liquidated. While the Postal Officer testified that this agreement was reasonable in view of the fact that messing and berthing were provided to the appellant, we judicially note that payments of $600.00 per month left this E–3 appellant relatively little disposable pay, especially in view of his child support obligation of $200.00–250.00 per month.

### Admissibility of Expert Handwriting Testimony

The appellant contends that the military judge erred in admitting the expert testimony of a handwriting examiner employed by the Naval Criminal Investigative Service (NCIS), because handwriting analysis does not meet the tests for validity and reliability established by the Supreme Court. The Government responds that the military judge did not abuse his discretion in admitting this testimony. We concur with the Government.

The Government proffered the testimony of Mr. Marc Jaskolka for analysis of the forged money orders and handwriting exemplars taken from the appellant. The defense

1. This money order is not the subject of any charge.

then moved *in limine* to prevent Mr. Jaskolka from testifying. In his testimony on the motion, Mr. Jaskolka stated that he had 19 years of training and experience in the field of forensic document examination[2] and had testified in court at least 75 times as an expert in that subject. His personal qualifications were not the focus of the defense motion. Rather, the motion presented a broad-scale attack on the validity and reliability of handwriting analysis by experts who have no previous familiarity with the handwriting of an accused service member.

According to Mr. Jaskolka, forensic document examiners have been allowed to testify in American courts for 80–90 years. He described handwriting analysis as a learned skill rather than a scientific process. When asked how such analysis might be validated, Mr. Jaskolka referred to the studies done by Professor Moshe Kam of Drexel University. In these studies, a group of lay university students were asked to analyze handwriting samples with known exemplars to determine authorship. A group of forensic document examiners were also asked to do the same analysis. The results showed that the lay analysts had an error rate of approximately 35–40% while the expert analysts had an error rate of about 6%. Mr. Jaskolka also testified that his work is tested and evaluated by another examiner in his office and by the American Society of Crime Laboratory Directors, as well as the American Board of Forensic Document Examiners.

The military judge denied the motion and admitted the expert testimony, finding the reasoning of *United States v. Ruth,* 42 M.J. 730 (Army Ct.Crim.App.1995), *affirmed,* 46 M.J. 1 (1997), and *United States v. Starzecpyzel,* 880 F.Supp. 1027 (S.D.N.Y.1995) to be persuasive. He concluded that handwriting analysis is "not scientific evidence for purposes of *Daubert* analysis" in that it consists of technical or other specialized knowledge. He also concluded that the proffered testimony of Mr. Jaskolka would be of some assistance to the finders of fact. *See* MILITARY RULE OF EVIDENCE 702, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court clarified the admissibility requirements for expert scientific testimony. It held that the old "general acceptance in the scientific community" standard, articulated in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), had been superseded by Federal Rule of Evidence 702. That rule focuses on the admissibility of three categories of expert testimony that "will assist the trier of fact to understand the evidence or to determine a fact in issue." The three categories are "scientific, technical, or other specialized knowledge." MIL.R.EVID. 702. In doing so, the *Daubert* Court set forth a list of factors a trial judge should consider in assessing the validity and associated relevance of proffered expert scientific testimony: (1) whether the theory or technique in question can be (and has been) tested, (2) whether it has been subjected to peer review and publication, (3) its known or potential error rate, and (4) whether it has attracted widespread acceptance within a relevant scientific community. *Daubert,* 509 U.S. at 594, 113 S.Ct. 2786.

Six years later, the Supreme Court addressed the general issue whether the rationale of *Daubert* applied to nonscientific technical or other specialized knowledge. In *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Court held:

> We conclude that *Daubert's* general holding-setting forth the trial judge's general "gatekeeping" obligation—applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge. *See* Fed. Rule Evid. 702. We also conclude that a trial court *may* consider one or more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in *Daubert,* the test of reliability is "flexible," and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district

---

**2.** During Mr. Jaskolka's testimony on the motion and the merits, the terms forensic document examination and handwriting analysis were used interchangeably.

court the same broad latitude when it determines *how* to determine reliability as it enjoys in respect to its ultimate reliability determination.

*Id.* at 141–42, 119 S.Ct. 1167. Thus, when the issue is raised, a trial judge must apply flexible *Daubert* analysis in evaluating the admissibility of proffered expert testimony, whether it be scientific, technical, or other specialized knowledge.

■ In the case at bar, we note that the military judge did not explicitly conduct a *Daubert* analysis of the proffered testimony of Mr. Jaskolka, presumably because *Kumho Tire* had not yet been decided, and the issue of applicability of *Daubert* analysis to handwriting analysis was unsettled. The standard of review for a trial judge's ruling regarding admissibility of expert testimony is abuse of discretion. *United States v. Houser*, 36 M.J. 392, 397 (C.M.A.1993). "That standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion." *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167. We will not set aside a trial judge's decision to admit or exclude evidence unless there is a "definite and firm conclusion that the court below committed a clear error of judgement." *Houser*, 36 M.J. at 397 (citations omitted).

Because the military judge simply relied on the reasoning of the *Starzecpyzel* and *Ruth* decisions in evaluating the reliability and relevance of the expert's proffered testimony, we will now review those cases as we consider whether there is an abuse of discretion. In *Starzecpyzel*, the court heard extensive testimony from defenders and critics of handwriting analysis in the course of a *Daubert* hearing. That court observed that "forensic document examination ... does not rest on carefully articulated postulates, does not employ rigorous methodology, and has not convincingly documented the accuracy of its determinations," but the court ultimately concluded that it "does involve true expertise, which may prove helpful to a fact-finder." *Starzecpyzel*, 880 F.Supp. at 1028–29. The court went on to note that "such experts, who acquire their skills through practical training, apprenticeships, and long years of practice, are generally not expected to be able to articulate and justify the theoretical bases underlying their practice, to expose their techniques to a larger community of practitioners through peer-reviewed publication, or to subject those techniques to extensive testing." *Id.* at 1029.

In *Ruth*, the Army Court of Criminal Appeals analyzed the *Starzecpyzel* opinion and concurred that "handwriting analysis evidence is best treated under Mil.R.Evid. 702 as 'technical, or other specialized knowledge.' Thus we also agree that such evidence need not meet the validity factors of *Daubert* before it can be admitted into evidence under Mil.R.Evid. 702." *Ruth*, 42 M.J. at 732. The Court then went on to conclude that under Mil.R.Evid. 702, expert testimony may assist court-martial members "by focusing their attention on the minute similarities and dissimilarities between exemplars that panel members might otherwise miss when they perform their own visual comparisons." *Id.* (citation omitted).

■ Having carefully considered these authorities and the record before us, we are convinced that, whether a rigorous *Daubert/Kumho Tire* analysis is employed, or an older, traditional scrutiny under Mil.R.Evid. 702 is used, expert testimony in the field of handwriting analysis is generally valid and reliable, and may properly be admitted in trials by court-martial. Although some critics may feel otherwise, this field of practical expertise is not the type of "junk science" about which the Supreme Court was most concerned in *Daubert*. *See Kumho Tire*, 526 U.S. at 158, 119 S.Ct. 1167 (Scalia, J., concurring). Rather, as Mr. Jaskolka testified, expert testimony in this field has been routinely admitted in civilian criminal trials and courts-martial for many years. *See United States v. Alfred*, 10 M.J. 170, 171 (C.M.A. 1981); *United States v. Conley*, 4 M.J. 327, 329 (C.M.A.1978). We also note that, while not specifically addressing this issue, our superior Court affirmed the Army court's decision in *Ruth*. *United States v. Ruth*, 46 M.J. 1 (1997).

■ This is not to say that every purported expert in handwriting analysis should be allowed to testify. As with any other prof-

fered expert witness, the military judge must carefully consider the personal qualifications of a handwriting analyst. If satisfied that the expert is personally qualified to take the stand, the military judge also must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 152, 119 S.Ct. 1167.[3] We note that, in the case at bar, the military judge heard and considered extensive testimony on Mr. Jaskolka's personal qualifications and the manner in which he analyzed raw data in offering his opinions.

■ We also emphasize that, once admitted, expert handwriting testimony should be accompanied by instructions from the military judge as to how the members may consider that testimony in their deliberations. Here, the military judge did so effectively, using part of a defense-requested instruction.

■ The military judge heard testimony regarding the general acceptance of expert handwriting analysis testimony in courts for 80–90 years. He also considered testimony of university studies on potential error rates, as well as testing and evaluation by peers and professional organizations in the field. Finally, he relied heavily on the well-reasoned decisions of other courts containing testimony that addressed the *Daubert/Kumho Tire* factors. We hold that the military judge did not abuse his discretion in admitting this expert testimony in the field of handwriting analysis. The assignment of error is without merit.

### Multiple Article Larcenies

■ In a summary assignment of error, the appellant contends that the specifications within Charges I through IV (larceny, forgery, dereliction of duty, and larceny of mail matter) regarding PO Pedrero's money orders should be consolidated as "multiple article larcenies" since the acts involved three money orders taken from the same envelope. The Government's response is two-fold.

First, it opposes the apparent argument that specifications of larceny, forgery, and dereliction of duty should all be consolidated into one specification. Second, it concedes that Specifications 1–3 under Charge I (larceny) should be consolidated. *United States v. Harris,* 53 M.J. 514, 522 (N.M.Ct.Crim.App. 2000); MANUAL FOR COURTS-MARTIAL, UNITED STATES, (1998 ed.), Part IV, ¶ 46c(1)(h)(ii). We concur with the Government.

PO Pedrero's three money orders were each the subject of a separate specification under Charges I through IV: larceny, forgery, dereliction of duty, and larceny of mail matter. The evidence suggests that the appellant took the money orders simultaneously from the envelope PO Pedrero sent to her mother. Accordingly, pursuant to *Harris,* only one larceny should be charged. In our decretal paragraph, we will take corrective action by consolidating Specifications 1–3 of Charge I. However, the appellant has provided no authority for the proposition that specifications of forgery and dereliction of duty should be consolidated. To that extent, this summary assignment of error has no merit.

### Conclusion

We have carefully considered the remaining assignments of error, including the argument that the evidence was legally and factually insufficient, and find them to be without merit. We consolidate Specifications 1–3 of Charge I into a single specification to read as follows:

> Specification: In that Postal Clerk Seaman George H. Elmore, Jr., U.S. Navy, U.S. Naval Station, Guantanamo Bay, Cuba, on active duty, did, on board the U.S. Naval Base, Guantanamo Bay, Cuba, during August through September 1996, steal postal money order # 8087436266, of a value of $700.00, postal money order # 8087436268, of a value of $700.00, and postal money order # 8087436267, of a value of $700.00, the property of Mess Management Specialist Third Class Norma L. Pedrero, U.S. Navy.

---

3. For one expert's guidance to trial judges, *see* Edward M. Imwinkelried, *Evaluating the Reliability of Nonscientific Expert Testimony: a Partial Answer to the Questions Left Unresolved by Kumho tire Co. v. Carmichael,* 52 Me.L.Rev. 19 (2000).

With this modification, we affirm the findings. Based upon our action on the findings, we have reassessed the appellant's sentence in accordance with the principles of *United States v. Cook*, 48 M .J. 434, 438 (1998), *United States v. Peoples*, 29 M.J. 426, 428 (C.M.A.1990), and *United States v. Sales*, 22 M.J. 305, 307–08 (C .M.A.1986). Upon reassessment, we affirm only so much of the sentence that includes confinement for 30 months, a fine of $3421.00, reduction to E–1, forfeiture of all pay and allowances, and a bad-conduct discharge. An appropriate convening authority will issue a corrected promulgating order consistent with this decision. The corrected order shall include the reduction in rate in stating the adjudged sentence.

Senior Judge ANDERSON and Judge VILLEMEZ, concur.